Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio




# MEMORANDUM OPINION

No. 04-09-00215-CR

Mark **STALEY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2003-CR-7441
Honorable Juanita A. Vasquez-Gardner, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:        Sandee Bryan Marion, Justice
               Phylis J. Speedlin, Justice
               Marialyn Barnard, Justice

Delivered and Filed:  July 7, 2010

AFFIRMED

A jury found appellant, Mark Staley, guilty of intentionally and knowingly causing the death of Isaiah Richards by shooting Richards with a deadly weapon, and for knowingly and intentionally carrying a handgun on premises licensed and permitted by the State of Texas for selling alcohol. The jury assessed punishment at sixty and ten years' confinement, respectively. On appeal, appellant asserts the trial court erred in instructing the jury on a "provoking the difficulty" charge, and in allowing into evidence his flight from Texas after he was indicted.

Appellant also challenges the legal and factual sufficiency of the evidence in support of the murder conviction.[1] We affirm.

## SUFFICIENCY OF THE EVIDENCE

Appellant asserts the evidence in support of the jury's verdict was legally and factually insufficient because the evidence supports a finding that he was justified in using deadly force to protect himself and his sister, Vanessa Staley. We construe appellant's argument as a challenge to the jury's implicit rejection of his defensive theories.

### A.      Standard of Review

A person "is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2010). If a person uses deadly force, his conduct is justified if (1) he would be justified in using force in self-defense, and (2) the use of force is to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a). A person is justified in using deadly force against another to protect a third person if: (1) "under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect"; and (2) "the actor reasonably believes that his intervention is immediately necessary to protect the third person." *Id.* § 9.33 (Vernon 2003).

A defendant has the burden of producing some evidence to support a claim of self-defense or defense of a third person. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App.

---

[1] On appeal, appellant does not challenge his conviction for carrying a handgun on licensed premises.

2003). Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. *Zuliani*, 97 S.W.3d at 594; *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991); *see* also TEX. PENAL CODE § 2.03. However, the burden of persuasion is not one that requires the production of evidence; it requires only that the State prove its case beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 913. When a jury finds the defendant guilty; there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

**B.    Review of Evidence**

On the night of May 22, 2003, Isaiah Richards and a group of friends went to The Safe House Drinkery Bar. Richards was already drunk by the time they arrived at the bar. Appellant and his sister Vanessa were also at the bar. As closing time approached, Richards reached into the tip jar and removed a dollar. According to one of his friends, Sarah Smith, Richards did not need the money and he "thought he was being cute and funny." Smith noticed that another man saw Richards take the money, and this other man motioned for one of the bartenders to come to his end of the bar. Smith heard the man tell the bartender, whose first name was Shannon, what Richards had done and, because Shannon looked annoyed, Smith went over to tell her that Richards was a friend and she would repay the money. Smith walked back to Richards, who was still in a "goofy" mood, and told him to give her the dollar, which he did. Smith threw the dollar at Shannon, who was "being bitchy toward" Richards. During this time, Smith said everyone was trying to close out their bill for the evening. Richards and Shannon began to exchange obscenities and Shannon told Richards to leave the bar. At this point, three or four other men who are regulars at the bar overheard the shouting and approached Richards, Smith, and their friends. Smith and her friends got Richards up from his bar stool, and they moved with him out

of the bar. On their way out, other people pushed Richards toward the door. As Richards and his friends left the bar, Richards became more aggressive with the crowd, and he grabbed the hair of another bartender because he thought this bartender was trying to fight with him. When Richards was told the bartender was not trying to fight him and was, instead, trying to break up the crowd, Richards let go of the hair. Once outside, as the crowd continued to push Richards along the sidewalk, Smith walked in the direction of Richards' car with the intention of driving it around to pick up Richards and drive him home.

At some point, Richards hit the window of another business located near the bar. As Smith pulled up in the car, she saw a black Tahoe also moving through the parking lot. She watched as Richards began to bang on the Tahoe's passenger window and tell someone to get out of the vehicle. The Tahoe drove away, and Smith got out of the car she was driving and walked over to Richards. Smith said Richards turned to face her and "he just looks right through me and - - and runs past me to - - towards [appellant]." When she turned around to face appellant, she said appellant's hands were up in the air "as if, you know, the guy thing that you do if you're going to fight somebody . . . ." Smith described "the guy thing" as

> Just like come on, come on, bring it on. You know, some macho guy move, you know. It's just like, come on, if you're kind of egging him on. . . . Like if you want to fight somebody. I'm right here kind of thing.

Smith said appellant's sister, Vanessa, was standing next to appellant and facing him with her hands out. It appeared to Smith as if appellant's sister was telling appellant to calm down. She said appellant "just stood there" and she assumed appellant was "yelling and talking shit to" Richards. Richards ran at appellant and he knocked appellant's sister to the side, and she fell to the ground. Another witness testified he saw appellant and Richards "pushing and wrestling,"

and he thought Vanessa tried to get in between the men to break up the fight, and this was when she got hit by Richards.

Lindsay Heagerty testified she was sleeping in her boyfriend's car when she was awakened by two men swearing at each other. Seconds later, she heard gunfire. When she looked in the direction of the shouting and the gunshots, she saw Richards fall to the ground and appellant "pulling the gun down and putting it back into his pants." Richards had been shot five times.

The driver of the Tahoe, Harold Critney, said he saw appellant running down a grassy hill. When Critney pulled up next to appellant, appellant jumped into the Tahoe saying "go, go, go" and "Oh my god I shot him and it was self defense." Critney drove to a restaurant and, when they stopped, appellant got out of the vehicle, put the bullets from his gun into his mouth and then spat the bullets onto the ground behind the restaurant. Afterwards, everyone drove to appellant's apartment. At some point, Critney allowed appellant to place his gun case in the back of the Tahoe because appellant did not have a concealed weapon license and appellant wanted to say the case was in Critney's truck because they had been at a firing range a few days earlier. Although Critney initially lied to the police, he later admitted he and appellant had not been to a gun range. About thirty minutes after arriving at appellant's apartment, Vanessa also arrived. Critney saw her hit herself in the face and, at her request, he took pictures of her injured face.

Vanessa said she saw Richards hitting the Tahoe and trying to grab one of the passengers. She testified that when she went to ask Richards to stop, Richards grabbed her by the throat, threw her on the ground, and hit her over and over again. Vanessa testified she heard her brother say "That's my sister. Get the fuck off of her, leave her alone." She denied that Richards merely

bumped into her. However, Vanessa admitted she later hit herself because she did not believe her face, which was swollen, looked as bad as it felt. Vanessa thought her face did not portray what she had been through, and she did not believe the police "would know the severity" of what she had been through. Vanessa testified Richards charged at her brother, the two struggled, and they rolled down a hill. Before hearing the gunshots, she heard her brother tell Richards to get back and that he had a gun. According to Vanessa, Richards would not get back, but instead he "kept coming at" appellant. She said her brother tried to get away from Richards, but was unable to.

Jonathan King testified he was at the bar with a group of friends and he spoke with appellant, who asked him if he (King) "would get his [appellant's] back in a fight." King declined, and appellant told King not to worry about it because "there would be a bunch of [appellant's] friends waiting outside and we could just watch." After this conversation, another friend of King's told King that appellant wanted to fight with Richards. Marco Guerro testified he did not believe appellant was looking for a fight, but he admitted he saw that appellant was carrying a gun. While Guerro and appellant were inside the bar, appellant pointed out Richards and said that years earlier, while they were in high school, he had been "jumped" by Richards and another individual.

Appellant testified in his own behalf and admitted to shooting and killing Richards. He said he had the gun with him on the night of the shooting because he had been mugged a few weeks earlier and he carried the gun for personal protection. He said he put the bullets into his mouth because he did not want a loaded gun in the car if they were stopped by police and he did not want his fingerprints on the bullets "if they were ever used in another crime." Appellant turned himself in approximately one month after he was indicted for murder, and he made his

initial appearance. Appellant was bonded out, the State dismissed the charge and then refiled. Appellant again bonded out. The State then brought charges on an unrelated drug case. Appellant failed to make his initial appearance in the drug case, and he went into fugitive status. He was later extradited from Canada.

In this case, it was within the jury's province to resolve conflicts in the evidence and decide which version of the events to believe. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000); *see also Mosley v. State*, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998). In doing so, the jury could reasonably conclude that appellant did not act in either self-defense or in defense of his sister. Reviewing the record under the appropriate standard, we find the evidence is legally and factually sufficient to support both the jury's rejection of defendant's self-defense claim and appellant's conviction for murder.

## JURY INSTRUCTION

In the jury charge, appellant's self-defense theory was limited by a "provoking the difficulty" instruction that tracked Texas Penal Code section 9.31(b)(4), which provides that the use of force against another is not justified if the defendant provoked the other's use or attempted use of force, unless:

> (A) the [defendant] abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and
> (B) the other nevertheless continues or attempts to use unlawful force against the [defendant] . . . .

TEX. PENAL CODE ANN. § 9.31(b)(4).

On appeal, appellant asserts Sarah Smith was the only witness to testify about whether appellant may have provoked the difficulty with Richards and the single act on his part about which Smith testified — his hand gestures allegedly "egging" Richards on — was not an act that

could be reasonably calculated to provoke Richards to attack appellant. Provoking the difficulty can limit or bar a defendant's right to the benefit of self-defense. *Id.*; *Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998). An instruction on provocation is proper when the evidence, viewed in the light most favorable to giving the instruction, would permit a rational jury to find beyond a reasonable doubt that: (1) the defendant did some act or said some words that provoked the attack on him; (2) the act or words were reasonably calculated to instigate the attack; and (3) the defendant did the act or said the words meaning and intending that the defendant would have a pretext for harming the victim. *Smith*, 965 S.W.2d at 513-14 (clarifying when the issue properly should be submitted to the jury). Each of the factors is a fact question. *Id.* at 513.

The first element, that appellant did some act or used some words that provoked the attack on him, triggers the inquiry into whether the issue of provocation may be present in the case. *Smith*, 965 S.W.2d at 514. If the evidence allows an inference beyond a reasonable doubt that Richards attacked appellant in response to something appellant did or said, this will be sufficient to allow the jury to find the first issue in the affirmative. *Id.* at 516. "The jury must merely be able to find that there was *some* provoking act or words." *Id.* at 515. Here, the jury could find that appellant's hand-gestures as described by Smith provoked Richards to charge at appellant.

The second element of provoking the difficulty is that the appellant's acts or words were reasonably calculated to provoke the attack. *Id.* at 517. "An act is reasonably calculated to cause an attack if it is reasonably capable of causing an attack, or if it has a reasonable tendency to cause an attack." *Id.* Some provoking acts or words can by their own nature be legally sufficient to support a jury finding. *Id.* Alternatively, the act or words taken in conjunction with the relations of the parties and other circumstances surrounding the difficulty can provide the basis

for such a finding. *Id.* As stated above, whether an act is reasonably calculated to cause an attack can be determined from circumstantial evidence. *Id.*

Here, appellant had been "jumped" by Richards years before the shooting. On the night of the shooting, appellant wanted to fight Richards. Richards was already drunk and acting aggressively when appellant gestured in a way that "egged on" Richards. This evidence, viewed in the light most favorable to giving the jury the instruction, shows appellant's actions were reasonably capable of provoking an attack by Richards.

The last element to be considered is the intent to use the provocation as a pretext for inflicting harm. *Id.* at 518. There must be sufficient evidence that would allow a rational jury to find appellant possessed an intent to provoke so he would have a pretext to harm under a guise of self-defense. Without "intent that the act would have such an effect as part of a larger plan of doing the victim harm, [the appellant] does not lose his right to self-defense." *Id.* Intent is a question of fact to be determined from all the circumstances. *Id.* When determining intent, a jury can consider appellant's behavior during and after the crime, but the jury is also free to consider acts occurring prior to the incident. *Id.* Here, appellant's prior relationship with Richards and appellant's prior behavior — being "jumped" by Richards while they were in high school and appellant coming to the bar armed with a handgun — as well as appellant indicating he wanted to fight Richards and "egged him on" could allow a reasonable jury to find intent to use provocation as a pretext for harming Richards.

Viewing the evidence in a light most favorable to giving the instruction, there was sufficient evidence for a jury to find the necessary elements of provocation beyond a reasonable doubt. Therefore, we conclude the trial court properly instructed the jury on the law of provocation as a limitation to self-defense.

## EVIDENCE OF FLIGHT

Finally, appellant asserts the trial court erred by allowing details of his pretrial flight into evidence.[2] Appellant contends evidence of his flight was more prejudicial than probative because it distracted the jury from the issue of whether he was justified in using deadly force in self-defense.

Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn. *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994). Evidence of flight is admissible if it appears that the flight has some legal relevance to the offense under prosecution. *Id.* Such evidence may be excluded under relevancy challenges, if the defendant affirmatively shows the flight directly connects to some other transaction and that it was not connected with the offense at trial. *Id.*

At a pretrial hearing on appellant's motion in limine, defense counsel argued appellant fled because he had no money to bond out on the drug charge and, therefore, he fled because he was afraid of going to jail. Merely showing that other criminal charges are pending at the time of flight is not sufficient. *Wockenfuss v. State*, 521 S.W.2d 630, 632 (Tex. Crim. App. 1975). If appellant's flight was in relation to more than one offense, evidence of flight is admissible to all offenses rather than none. *Id.* "The State [is] not required to negative a relation to other offenses." *Id.* Therefore, we conclude appellant did not meet his burden of affirmatively showing his flight was directly connected to the pending drug charges and not connected with the murder charge. Thus, evidence of appellant's flight was relevant.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

---

[2] In his fact summary, appellant contends the State did not provide proper notice of its intent to use evidence of his flight. Appellant does not elaborate on this contention except to state he was not prepared to rebut allegations of flight. This complaint is waived as inadequately briefed.

considerations of undue delay, or needless presentation of cumulative evidence." Tᴇx. R. Eᴠɪᴅ. 403. A Rule 403 analysis includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005).

Evidence of flight "goes to the very guilt of appellant," and, unlike other extraneous offenses, it "shows a consciousness of guilt of the crime for which the [appellant] is on trial." *Bigby*, 892 S.W.2d at 884. Therefore, evidence of appellant's flight had probative value because it concerned a fact of consequence, his guilt. Because appellant claimed he acted in self-defense, the State needed the evidence to further substantiate its case. And, the State took very little time to develop the evidence. In view of appellant's other attempts to avoid prosecution — placing the gun case in the Tahoe, cleaning the shell casings with his mouth, and asking others to lie for him — appellant's flight probably had little potential to confuse the jury or impress the jury in some irrational, yet indelible, way. Although the evidence indicates some degree of appellant's guilt, it "is not the type of misconduct that can be said to have great unfair prejudicial danger." *Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd). Therefore, the probative value of evidence of appellant's flight was not substantially outweighed by the danger of unfair prejudice.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.


Sandee Bryan Marion, Justice

DO NOT PUBLISH